Haynes, J.
In this case a petition in error is filed for the purpose of reversing the judgment of the court of common pleas.
It appears from the record that Edward Bennett, at the January term of the court of common pleas for this county, *85 was indicted for, “ That he did unlawfully, purposely and maliciously kill George M. Sullivan, then and there,” being an indictment for murder in the second degree under the statutes of the state of Ohio. The case was tried by a jury, and a verdict was rendered finding the defendant guilty of murder in the second degree, in manner, and form as he stands charged in the indictment. Thereupon a motion for a new trial wras interposed, setting forth a large number of alleged errors which it was said had occurred at the trial of the case. That motion coming on for hearing was heard and overruled, and it was assigned for error here that the court erred in overruling the motion for a new trial. The petition in error having been filed, the case came on for argument, here, and has been argued by counsel, and three points are alleged as the main points of error in the case.
The first is that the court erred in the admission of certain evidence, or rather in refusing to admit certain evidence. More strictly, that it erred by refusing to allow counsel for the defendant to propound certain questions to witnesses upon cross-examination, which it is claimed by counsel were matters they were entitled to call out on cross examination of the State’s witnesses. The second is, because of the alleged irregularity in the proceedings of the court, which I will refer to at more length hereafter; and the third is,that the verdict is not sustained by sufficient evidence, and is contrary to law.
In regard to the first error, we will say briefly, that the matters that were sought to be brought out on cross examination were not so strictly within the matters subject to cross-examination as to call for any action on the part of this court. Very much must be left to the discretion of the trial judge. There has been some difference of opinion and some variety of practice in this state, as to the extent a party may go in cross-examination, and while some courts have allowed the defendant a large latitude in cross-examination, the general rule has been that he must not go into those matters which are purely matters of defense, and the court following that *86 rule of practice, based his decision upon it. The matters that were sought to be brought|out were afterwards brought out in proper course, on examination of witnesses on the stand, and the defendant had the benefit of the testimony of those witnesses. In the action of the court in that regard we see no ground for error, and no injury to the rights of the defendant.
The other two questions are matters of great importance, and matters to which we have given our attention at length and very earnestly. We have made a very careful examination of the testimony in the case. The alleged irregularity of the court is set forth in the bill of exceptions, commencing on page 649, of the bill of exceptions and reads as follows:
“ And thereupon, at 1 o’clock and 29 minutes, on the afternoon of said day, to-wit: the third day of February, 1894, the said jury retired to their room in charge of the sheriff, for deliberation, and said defendant, Edward Bennett, upon the retirement of saidjury, was immediately, to-wit: at 1:30 p. m. of said day, under the order of said court, taken by the officer thereof, to the county jail and committed thereto as a prisoner in the custody of said sheriff, and thereafter, on the same day, to-wit: at the hour of five minutes to five o’clock in the afternoon, the said Edward Bennett, at that time being confined as aforesaid a prisoner in said county jail, and having no notice thereof, and neither one of his attorneys being present in court, or having any notice of the same, said court ordered said j ury again brought back into open court, which was done accordingly; and thereupon, in the absence of said defendant, who wms so confined in the county jail as above stated, and in the absence of his said counsel, neither one of whom was present in court, or in the court-house, said court interrogated and communicated with said jury as follows, to-wit :
“ ‘ Gentlemen, I have called you in on my own account. I cannot get away to-night, unless I go very soon, and I would like to know the state of your deliberations, and whether you are likely to arrive at a verdict soon. Are you likely to come to a verdict within the next fifteen minutes?’
. “And thereupon, the foreman of said jury, to-wit: one *87 George Krapp, said to said court in answer to said interrogatory, as follows, to-wit:
‘“Indications point that way/
“And thereupon said court further said to said jury, as follows, to-wit:
“ * I do not want to hurry you up unnecessarily, but I cannot get home at all for Sunday, unless I go very soon, and it is that I want to inquire about. I called you in for that purpose. If you are likely to come to a verdict you may retire again and resume your deliberations. Be as expeditious as you conveniently can/
“ And thereupon said jury, under the order of said court, were again taken in charge by the officer thereof, and again retired to their room for further deliberation.
“ Neither the said defendant, Edward Bennett, nor his counsel, nor either of the same having any notice or knowledge whatever that said proceedings, as above set forth, were had by said court and said jury, but the said defendant during all of said time, was confined as a prisoner in the jail of the said county, as above stated.
“And at fifteen minutes past five o’clock, in the afternoon of the same day, said jury announced that they had agreed upon their verdict herein, and were thereupon again brought into open court by the officer thereof, with the verdict, which was returned and read in the presence of said defendant, and said jury was polled at the request of defendant’s counsel, and each of the same answered that the same was his verdict. And the jury having found the defendant guilty of murder in the second degree, in manner and form as he stands charged in said indictment, the defendant within three days thereafter made a motion for a new trial,” and so forth.
It is very evident, to say the least, that the action of the court in bringing the jury in and havingthe conversation with them which it did, was an improvident act on the part of the court. The effect that is to be given to that action depends upon the principles of the law that are laid down by the Supreme Court of this state, and the general rules that should govern the conduct of jury trials. It is well known to the profession that the Bill of Rights of the Constitution of the State provides that the party accused shall be allowed to ap *88 pear and defend in person and with counsel; to demand the nature and cause of the accusation against him, and to have a copy thereof; to meet the witnesses face to face, and to have compulsory process to procure the attendance of witnesses in his behalf, and a speedy public trial by an impartial jury of the county or district in whieh the offense is alleged to have been committed ; nor shall any person be compelled in any criminal case to be a witness against himself, or be twice put in jeopardy for the same offense.
Some decisions have been made by the Supreme Court of this state upon the subject, and it may be well, perhaps, to refer to these for the purpose of refreshing our recollections as to some [of the principles laid down by the Supreme Court. I shall not attempt to refer to all of the decisions that have been made, but refer to one or two of the leading decisions.
In the case of Jones v. The State of Ohio, decided by the Supreme Court at the December term, 1875, and found in the 26 Ohio St. p. 208, the defendant was indicted for crime of murder in the second degree, and was afterwards found guilty of manslaughter, and sentenced to be imprisoned in the penitentiary.
On the trial, as the record shows, the case was submitted to the jury for their verdict at five o’clock in the evening, and the defendant was remanded to the jail of the county. At seven o’clock next morning the jury returned into court and requested further instructions on points material to the issue. Thereupon, in the absence of the defendant, who was still confined in jail, the court again instructed the jury on the points requested, “in tenor and effect as first charged.” Shortly afterward the jury again returned into court, and in the presence of the defendant, returned the verdict of guilty, as above stated. At the giving of the last instructions, one of the defendant’s counsel was present, and made no objection.
The record does not show the nature of the instructions given, further than that they were material to the issue.
*89 By the reporter of the court, in his statement of the case, taken, we suppose, from the bill of exceptions, it is said that they were “in the tenor and effect as first charged.”
By the Court: “ We are unanimously of the opinion, that on the trial of a felony it is error to proceed, at any stage of the trial, during the enforced absence of the accused, save only in the matter of the secret deliberations of the jury, and perhaps in the hearing of motions after verdict and before judgment.
“ It was the right of the plaintiff in error to be present at each and every instruction given to the jury, as to the law of the case. This right was denied to him by reason of his imprisonment under the order of the court; and without inquiry as to the correctness of the instruction so given in his absence, it will be presumed that he was prejudiced thereby-
“ Nor was the irregularity cured by the presence of his counsel at the time the additional instruction was given, and his failure to make objections. The right of the accused to be present on the trial of such case can not be waived by counsel.”
In Cantwell v. The State, 18 Ohio St., p. 477, decided in 1869, the defendant had been indicted for grand larceny, had been placed upon trial, had been convicted, and a motion for a new trial was filed on the grounds that the court improperly overruled certain matters, and that the court permitted the jury to separate during the trial. This motion was overruled, and a new trial refused ; and the first three points that were made were overruled by the Supreme Court, and the question came on for hearing on the fourth or last point, that the court permitted the jury to separate during the trial.
It is proper to say that at that time the 164th section of the criminal code was in force, the criminal code of 1869, wherein it was provided, among other things, that “in the trial of felonies the jury shall not be permitted to separate, after being sworn, until discharged by the court.” The jury in this case was permitted to separate from Saturday until Monday, *90 and separated, without being under the supervision of an officer, and were separated by the consent of the defendant and his counsel, as well as the counsel for the state. The Supreme Court say :
“ It may be regarded as an established principle in this state, that the defendant can not be prejudiced by his waiver of any statutory requisition in the prosecution of criminal offenses.”
The court further remarked :
“ It was held by this court at the last term, in the case of Parker v. The State, before the code of criminal procedure was adopted, that it was error to permit the jury in a criminal case to separate, after they had retired to deliberate, even though counsel for the defendant consent to their separation ; and although it was not expressly decided in that case, it was strongly intimated, that the consent of the defendant himself would have left him in no worse condition, for it is said in the opinion : ‘ The plaintiff in error should not be prejudiced even by a personal consent, given under circumstances when it could not be withheld, except at the risk of exciting unkind feelings in the breasts of the jurors who held his fate in their hands.’ This accords with what is said by Bishop in his work on Criminal Procedure, to be the better doctrine, ‘the consent of the prisoner to a separation, which the general rules of law do not permit should never be asked of him, and if it be asked and granted, or even granted without being asked, it will avail nothing.’
“ But the errors alleged are predicated on the motion for a new trial, which was based on the 192d section of the criminal code, and it is claimed that, under the provisions of that section it was not erroneously overruled, for the reason that the defendant was not thereby ‘ materially ’ prejudiced in his ‘substantial rights,’ nor prevented from having a fair trial.”
That section, which is now section 7350, reads as follows:
“ A new trial, after a verdict of conviction, may be granted on the application of the defendant, for any of the following reasons affecting materially his substantial rights:
“ 1. Irregularity in the proceedings of the court, jury, prosecuting attorney, or the witnesses for the state, or for any *91 order of the court, or abuse of discretion, by which the defendant was prevented from having a fair trial, etc.”
The court discusses the latter clause in the paragraph of this section :
“ A violation of this right, (that is, this right to have the jury kept together") in permitting the jury to separate and mingle generally with the community, without the restraining supervision of the proper officer, might, at least, subject them to influences prejudicial to him. The statute secured him against this hazard. It does not leave the defendant to the difficult task of proving, when the jury have been permitted to separate, that they have been improperly influenced, or have, in fact, been subject to such influences; for, however much he may have been prejudiced thereby, from the nature of the subject, it might be impossible to be shown, since, for reasons of public policy, jurors are competent only as witnesses to sustain, and not to impeach their verdict. The permitting the jury to separate did, therefore, affect materially a substantial right of the defendant. The ‘ order of the court* permitting the separation, was a violation of this right. It must, therefore, be admitted that he was thereby prevented from having a fair trial; for that can not be a fair trial, within the meaning of the statute, in which the defendant has been deprived, by order of the court, of a material safeguard secured to him by its positive provisions. The consent of the defendant to the order, as we have seen, does not mend the matter; for, in a case like this, the refusal of such consent might be more prejudicial to him than the separation of the jury, the evil provided against by the statute.”
The court further say:
“We arrive at the conclusion we have in this case the more cheerfully, because, although it is not affirmed that all the evidence is set forth in the record; enough does appear to lead us to doubt that the defendant was properly convicted; and, therefore, in the absence of any other error appearing in the record, we may .veil apprehend that, by reason of the error complained of, the evils provided against by the statute may have influenced their verdict.”
It is proper to say Judge White dissented from the decision in that case, holding that the action of the court did not prevent the defendant from having a fair trial.
*92 I have cited thus at length for the purpose of showing the general tenor and scope of the decisions of the Supreme Court. It might have been followed by other decisions in which the court have set aside verdicts where the jury have been visited by one of the judges who simply stated what the court had already said to them, and by other cases which are familiar to the profession. The general rule, we think, is clerly established, not only by the decisions of the Supreme Court of this state, but by the decisions of the courts of other states, and by the authority of legal writers of approved merit, that during all the proceedings of the court save and except when the jury are out for deliberation, the defendant has a right to be present in court when any proceedings, of whatever nature, are taken by the court in his case. The law is laid down so in Bishop on Criminal Procedure, cited here by the Supreme Court of this state, wherein that doctrine is broadly affirmed as a rule of criminal law to be followed by courts in criminal proceedings.
Giving this matter, now, a very careful consideration, and examining all the authorities that have been cited, and all we can find upon the subject, we are constrained to the conclusion that the court of common pleas erred in calling in the jury in the absence of the defendant, and in holding the conversation that he did hold with them at that time, which conversation is set forth in the bill of exceptions.
But that, of course, does not entirely decide the case upon that point, for, although it may have been an irregularity in the proceedings of the court, the question still remains whether it was such an irregularity as prevented the defendant from having a fair trial. That point has given us, perhaps, more trouble than the main question, but it will be seen from the decisions that I have cited — it will be seen as fully, perhaps, in many other decisions I have not cited, but which we have examined — that the courts are very jealous in regard to any violations of these rules, and they do not cast upon the pris *93 oner or the defendant in the case the burden of showing that he has been prejudiced.
For the reason stated- in the case I have just read, it might be a very difficult thing for him to do, and if the jurors themselves are not allowed to testify, it might be a thing that he would be deprived from doing, even although he might know that evidence existed among the jurors that might be of benefit to him.
Look at this case then for a moment. The defendant was put on trial for murder in the second degree, a matter affecting his liberty for life. His defense was that the homicide with which he ha been charged was committed while he was in a quarrel, while he was being attacked, while he was retreating, and was committed by him in self-defense. It was further submitted to the jury that if it was not committed in self-defense it was, at the most, simply a case of manslaughter, and not a case of murder in the second degree. The court, had charged the jury upon all these points, and the jury had retired for deliberation. The fact of stabbing was not practically denied. I believe it was not only admitted, but the defendant himself testified to the fact, so that there could be no question as to the killing to detain the jury for a moment. The question, evidently, they were discussing during the time they were out — for three hours — was as to the grade of the offense, or whether any offense had been committed, or whether the stabbing that had occurred was not justifiable, or at least excusable on the ground that the act was done in self-defense.
Now, while their deliberations are in progress, the court calls them out and makes inquiry in regard to the condition of their deliberations in the jury room, not whether they had agreed upon a verdict or not, but in what condition their deliberations were, whether they were likely to agree upon a verdict soon, and said to them if he went home at all that night to spend Sunday he would have to go in the course of a very few minutes, and they replied that indications pointed *94 towards an agreement of the jury, and thereupon sent them back to the jury room with an admonition to “ be as expeditious as you conveniently can.”
Now, the rights of a defendant in regard to the deliberations of a jury are well defined. It is provided, as I have read from the constitution, that he shall not be put twice into jeopardy for the same offense. As corrollary to that in the decisions of the courts in this state and other states, the court has no right to discharge the jury until it appears clearly that there is no reason to suppose that they can agree upon a verdict. He has a right to have the deliberations of the jury continued unobstructed and uninterfered with until they have so thoroughly canvassed the case, so thoroughly made up their minds in regard to it, either by way of agreement one way or the other, or else by differing so essentially in regard to the conclusions to be arrived at, that there is no prospect of one party or the other yielding. In case there has been sufficient deliberation and no hope of agreement, the court is authorized then to discharge the jury, and the prisoner may be put upon trial again for the same offense.
The constitution also provides that he shall have “a speedy public trial,” and that, public trial is held by the courts to be a trial not only that is open to the public, but a trial where he can be present; and he has the right under the constitution also to meet the witnesses face to face, and has a right to look in the faces of the jury during all the time the case is being heard; he has the right to be present when the court charges the jury; he has the right to be present whenever any step is taken in the case which may in any manner or form be said to be a portion of the trial of the case.
We all know that jurors are sensitive to the influence of the judge. Too often they are quite anxious to learn what the judge thinks about the case, and gather from any hint or word he may drop and the action he may take in the case as to the probable view he takes of the case, and with jurors who stand in doubt that often has a very material effect. In this case *95 the jury had not arrived at a conclusion, their deliberations were not finished, some juror or jurors in the room were differing from the opinions of some other jurors. Whether their deliberations were hastened by the fact of this admonition given by the court, or the thought that they might have to remain over Sunday if the judge went away, or to what extent that would have influenced them we cannot say; the jurors would not be permitted to say if they knew. The presumption of the law is where error has intervened in a criminal case, it is prejudicial to the defendant — has intervened against him. The burden is not cast upon him to prove the fact that it has been prejudicial to him, or to show whether it has been or not; and it seems to us that the conversation that was held by the court with this jury and his admonition to them, were of such a nature that it might well disturb their deliberations; it might well affect to some extent the minds of a hesitating or doubtful juror, one who had not fully made up his mind upon any particular question, and we certainly are unable to say that it was not prejudicial to the defendant. We, therefore, are brought to the conclusion that not only did the court err in this conversation it held with the jury, but that it was of such a nature and character as prevented the jury from having free deliberations upon the subject and coming to their own conclusion in regard to the matter — at least that it might affect that conclusion and prevent, in the language of the statute, the defendant from having a fair trial in the case.
We have said the action was undoubtedly improvidently taken. It was probably taken without the forethought which usually characterizes the conduct of the able judge who presided in the trial of this case. Nevertheless we are called to pass upon the act set forth in the record according to our own judgment after a full and fair deliberation upon the facts, and upon the law in regard to it.
I now approach the last alleged error, and that is that tbe verdict is against the weight of the evidence. The facts of the case are these in brief: Ed ward. Bennett was a waiter at *96 the Sloane house; Christ Parham was at the same time a waiter at the West House. They were both colored young men. They had been in the habit, from time to time, of going into a saloon upon Water street for the purpose of playing billiards, in a building that was adjacent to the West House. On the 20th of September, in the afternoon, they went in there to have a game of pool, and played two or three games. They were about leaving, but concluded to have another game. About that time Philip Kessler came into the room, and either with him, or immediately following him came William Sullivan, who is the person mentioned in the indictment as George M. Sullivan. They were both white persons. They concluded to have a game of pool, and made application to the proprietor of the saloon for leave, and he told them they could play a game, and thereupon they sought for the balls that are used in playing the game. When they found the balls they found a certain ball, which is called the “ flyer,” gone, and this being a necessary ball, the- proprietor told them to take one of the other balls, and they took a ball claimed by the colored boys. Thereupon a controversy quickly arose between the two parties, the colored boys and Kessler and Sullivan, about the possession of one of these balls or the taking of it, and that led to blows and the throwing of billiard balls, and shortly the attention of Mr. John' Wiedenhafer, jr., son of the proprietor of the saloon, was called to the trouble, and he interposed and told Kessler and the others to leave. Thereupon they started and went out, one after the other. The order of their going cannot be correctly stated, because the witnesses do not agree about it. They went out the back door, and immediately after getting into the back yard of the saloon Kessler and Parham engaged in a scuffle, and Bennett, who had come out, was also soon engaged in a scuffle, or in a controversy, or quarrel with Sullivan, and Sullivan was soon after stabbed. He went back into the saloon, fell upon the floor, and expired within a very few minutes. He was stabbed by Bénnett, as I have already *97 said; there is no question about that. Now, on what occurred outside, after the parties had left the saloon, hang principally the questions of fact and the law in this case.
That there was a controversy in the room there is no question ; that a biiliard ball was thrown and that Kessler was hit by one of the billiard balls there is no question. That Par-ham was struck in there, upon the arm with a billiard cue, I think there can be no question from the evidence; but as to what was done by the respective parties, the witnesses do not agree among themselves. It is quite difficult, perhaps almost impossible, to come to an accurate conclusion as to all that did take place. Sullivan was standing a little one side, and the witnesses Wiedenhafer, Jr., and Kessler say that he was doing nothing. Parham says at one time Sullivan said to Kessler, “give it to him.” That was about the time Kessler was attempting to strike Parham. John Wiedenhafer, Jr., says that Bennett threw two of the balls, and that one of the balls hit Kessler. Parham says he threw the balls at the time that Kessler struck him, and because Kessler did strike him. Bennett, it is claimed, did not throw the balls. According to the testimony of Frederick Federer, an employe of the saloon Bennett at the time the parties started out was standing with a cue in his hands, having both hands holding it, and he, Ferderer, said to Bennett: “Let me have that cue, we don’t want any quarrel;” and Bennett gave it to him. He took it and put it back in the rack where it belonged, and Bennett passed out. According to the testimony of Wiedenhafer, Jr., Kessler went out first, Parham following him; then Bennett, then Sullivan. Others place the order of going differently. Some of the witnesses who were there and who ought to have seen or known the order of things, did not see with sufficient distinctness, or did not remember clearly enough to state the order in which they went. John Wiedenhafer, Jr., who had come up there and taken hold of Parham and said to him there should be no more quarreling, and said when they went out he did not see any of them have a billiard cue. A man *98 named Smith, an elderly man who was standing near the bar, drinking a glass of beer with John Wiedenbafer, senior, and whose attention was called to the racket, says when they went out he saw one of the white men have a cue in bis hand. Beyond that his observation is very indefinite and shadowy, except that he saw a ball fly across the room towards the rear end of the room where, it seems, Kessler was situated at the time. The parties then passed out, this being about the situation of affairs, as the evidence discloses when they went out, then the testimony diverges.
Kessler, called as witness for the State, says that he and Par-ham were wrestling, and that Bennett followed them out and came up to him, Kessler, and struck at him; that Sullivan followed Bennett and was standing immediately at the head of some little stairs which they ascended as they came out of the saloon to go into the yard, and immediately after striking him, Kessler, Bennett started towards Sullivan who was still standing at the head of the stairs. There seemed to be a little scuffle between them, and immediately he saw' Bennett turn and run' past himself and Parham, and by a little building which had been used for a bottling house, around that being the road by which Bennett had come to the salaon and beyond that was the back alley so-called to the West House, servants quarters, through which Bennett was accustomed to pass in going to the Sloane House; that immediately after Bennett passed, Parham ceased his struggle with him', Kessler, and started off, and thereupon he, Kessler, started and went to Sullivan, and found Sullivan standing at the top of the stairs shivering, and that Sullivan spoke to him and said, “Philly, I am stabbed,” and thereupon he says he helped Sullivan into the saloon, and laid him down upon the floor where he so remained till he died. Sullivan could not talk after he spoke to Kessler.
Kessler says as Bennett passed him he saw that Bennett had a knife in his hand, saw the blade of it. I think be says it was a jack knife ; at any rate saw the blade of - the knife. It *99 will be seen from the testimony of Kessler that Bennett had approached Sullivan, and had dealt him this deadly blow, and if that were all the testimony, the jury upon that testimony might well have found Bennett guilty of murder in the second degree.
But there are other witnesses who testified in regard to this matter, and their testimony should be examined to see where the truth lies.
Frederick Federer, a witness called by the Slate, who was sitting in front of the saloon when the difficulty commenced, who is a man perhaps seventy years of age went up near the parties, and spoke to some of them, taking the cue away from Bennett; John Widenhafer, senior, and Smith, before referred to, both being witnesses called by the State, were standing at the bar sipping a glass of beer, and they both started towards the rear of the room. Smith, having seen the parties pass out of the room, returned to the sipping of his beer, and saw nothing more; but John Wiedenhafer, senior, went on towards the back of the room, and went to the window which overlooked this whole space of ground where Kessler says the parties were standing, or scuffling, as also did Frederick Federer, and the two stood there looking out of the window. When they arrived at the window, the back yard was clear. They could not s^e either Sullivan and Bennett, nor could they see Par-ham and Kessler. The testimony of these witnesses, so far it goes, tends to show Parham and Kessler in their struggles had passed around to the east of the door and behind some stairs that went up into an upper part of the building.
While they were there, Federer says, he opened the door, stepped out, and in a hollow between the windows he discovered a portion of a billiard cue, with about one-third of the top broken off, and he picked it up and brought it into the room. John Wiedenhafer, senior about that time himself stepped out, and stood there with a cane in his hand for the purpose of preventing any of these parties from returning into the saloon, and he remained there. Federer remained at *100 the window near the door. Now, while Federer was looking out of the window, they both saw Sullivan come from behind this building I have spoken of, called the bottling works, which was west of the saloon door, across the back yard, to the door of the saloon out of which parties had previously passed. The door was opened by Wiedenhafer, senior., and he opened the door for Sullivan to go in. Sullivan passed by him with his hand upon his side, and immediately fell down upon the floor, and Wiedenhafer, senior, remained with him until he expired. Wiedenhafer, senior, and Federer both testify, and testified very clearly, the positions in which they were standing, and showing they were standing by the window or outside the door, but both standing in positions that commanded the whole of the space that was covered by Kessler’s testimony, and covering all the space that lay between them and the entrance to the alley which was some few feet away west of the bottling house. They arrived at their positions very quickly after these men went out, and were both on the watch; so it is very clear, upon the testimony of both these witnesses, that Sullivan did not receive the wound from Bennett while standing in the place in which Kessler says he did stand. It was not while standing there that he was stabbed, according to the testimony of the above witnesses. According to the testimony of Federer, after Sullivan went back into the saloon Parham and Kessler swung around from behind the stairs into the front again, and Parham seized some stones to throw at Kessler, and Federer said to Parham, “ You must not throw them;” and thereupon Parham dropped the stones, and passed around into the alley and went away. There are some other things tending to discredit Kessler’s testimony. He had testified at the hearing before the Coroner that he stood within an arm’s length of Sullivan at the time he was stabbed by Bennett. He also there testifies that Bennett had a large bread knife with which he stabbed Sullivan ; that it was “that long,” indicating a space of about a foot. , His testimony in the common pleas differed from that essentially, and it is perfectly clear upon *101 the testimony for the State that Bennett was not armed with any such weapon; all he had was a large sized jack-knife. Kessler also testifies that he had no cue out in the yard, and that he took none with him when he passed out of the saloon.
There was a young man who testifies by the name of Frederick Butts, and he was also called by the State. Butts is a resident of this city (Sandusky); it seems he had resided here many years. He was employed in a confectionery store in the West block at the time of this stabbing. In pursuit of his duties he was out at the back door of this store in the West block quite frequently that afternoon. The door of the store opens back upon this space, and he could look over into the grounds in question, because this ground adjoins the West House, and could see what was going on. His testimony was not as clear and full and explicit as we would like to have it, but he does testify when he was there, that he saw Kessler, whom he knew, standing with a colored boy in front of him, and Kessler had in his hands a billiard cue. He says he cannot tell for the moment whether they were struggling or scuffling, but in the observation he made at the time he saw the cue distinctly, and knows who had it, so that it is very evident, we think, from his testimony, he saw this very fracas, and saw Kessler there with the cue in his hand. ■
We are forced to this conclusion in regard to Kessler’s testimony, that so far as the final result of this affray isconcerned, his testimony is of no value, and ought to be left out of consideration ; that the killing did not occur at the time or place in the manner in which he states. We are then left with this state of facts, that these men had passed out of the saloon in the manner stated; that one of the white boys went out armed with cues. It appears from the testimony of the Coroner that he made an examination of Bennett’s person the next morning, and that Bennett had upon his back a mark, a large welt; that he appeared to be lame in his arm, and it was difficult for him to pull off his coat. It appears from the testimony of the officers that arrested Bennett that when they arrested him at the Sloane House, which was only a few min *102 utes after the affray occurred, he asked them why he was arrested, and the return question was “why did you stab that man?” He said he stabbed him or cut him because he had hold of him, and would not let him go. He also stated in addition that Sullivan had followed him, and dealt him a blow with a cue, and it was for the purpose of ascertaining whether his statements were correct that the examination was made by the Coroner, at the time he found this mark or heavy welt.
The testimony of the defendant himself is that Sullivan followed him from the saloon; that he started to go to the Sloane House by way of the alley, and that as he turned the corner into the alley, or about that point, Sullivan, who had followed him, struck him across the back with a cue, and followed it up by attempting to inflict another blow which Bennett dodged, but which grazed his face a little, which mark was there. So that the testimony of Bennett is corroborated by the Coroner’s testimony, and we think that the testimony shows that the statement of Bennett is substantially true; that he was followed by Sullivan (for the testimony, generally, shows that Sullivan went out last); that Sullivan was armed with one of the cues, which, probably, he had in his hands in the saloon; that he followed Bennett out; that he struck him across the back with the cue ; that he struck at him again, and that some conflict ensued between them during which Sullivan was stabbed. The testimony of Bennett is, that Sullivan was following him up attempting to inflict these blows, until Sullivan got so close to him that he could not use the cue, and then closed with him. He says the force of the blow Sullivan gave him was such as to partly turn him around so that he was facing towards Sullivan, and Sullivan grabbed him around the arms, holding his arms by his side, and was attempting to trip him, and that he got the knife from his pocket, opened it and delivered the blow.
"Whether that be the correct statement of the affray or not, we think it must be held to be true in this case that Bennett was retreating, going from the place, passing from the saloon *103 in the direct route he would ordinarily take going to the Sloane House, and was followed by Sullivan, who was keeping up this quarrel, and who was inflicting bodily injury upon Bennett, and it was during that struggle that the fatal blows were given.
Now, the question is, and the important question, is whether that was murder in the second degree, upon the facts of the case. The statute of the state, now, by the revision, is changed in its phraseology, but not in its meaning. It is section 6810:
“ Whoever, purposely and maliciously, except as provided in the last two sections, kills another, is guilty of murder in the second degree, and shall be imprisoned in the penitentiary during life.”
There is a distinction between the offenses of murder in the first and second degrees in the state of Ohio from murder as it is described at common law. In the case of Fouts v. The State, in the 8th Ohio St., the Supreme Court discusses that question, and they hold that under the statute of the state of Ohio, making murder a statutory crime, the intent to kill must be averred in the indictment; that is to say, that the act which caused the death was inflicted with intent to kill.
I think this question has been before the courts from time to time in this state, and I shall not attempt to give all the decisions, but I shall state one or two of them in regard to this matter. The question has been before the Supreme Court within a month past in the case of Jones v. The State, which was error to the Circuit Court of Brown County, where the Supreme Court held that “an intention to kill is an essential element in the crime of murder in this state and must be established beyond a reasonable doubt, to authorize a verdict of murder in the first or second degree. This rule is not changed by reason of the accused contending, and introducing evidence tending to prove, that the homicide was accidental. The legal effect of such evidence being, simply, to controvert an inference of an intent to kill, which may arise from the evidence introduced by the State.” See Law Bulletin, p. 299, May 28,1894.
*104 In that case the father had been put upon trial charged with killing his son while he was attempting to get him away from a house of ill repute, and it was claimed by the father that the killing was accidental. The Supreme Court held that an intention to kill is an essential element of the crime, and must be established beyond all reasonable doubt by the State, to authorize a verdict of murder in the first or second degree. And that the rule was not changed by the defendant introducing evidence that the killing was accidental.' Now, that is a burden that is cast upon the State. It must show the intent to kill, and affirmatively. True, it may be shown by all the facts of the case, but the affirmative proof is upon the State to show by the evidence that.there was at the time the blow was given, an intent existing in the mind of the prisoner to kill the person whose life was taken.
It is argued' here that the defendant in this case was guilty of murder because he used a weapon that was dangerous j that to use it in the manner he did, would necessarily tend to produce death in the person who was stabbed. That question is discussed by.the Supreme Court in a case in the 29th Ohio St., Erwin v. The State, page 186, a case where person was indicted for murder — shooting, and the court had charged the jury, “if you find from the evidence the defendant used a deadly weapon in this case, and that death resulted from the use of such deadly weapon, then the law raises the presumption of malice in the defendant, and also an intent on his part to kill the decedent.”
The court say:
“We can well see how the jury, under these instructions, may have been led to convict the defendant of murder in the second degree, though guilty of manslaughter only, or even though not guilty of any crime whatever. It was plainly inferable, from the first instruction above stated, that the defendant’s crime was not manslaughter, if the killing were intentional. Such is not the law of manslaughter. If the killing .be unlawful, but \yithout malice as upon a sudden quarrel, although intentional, the crime is nevertheless manslaughter only. It is true that the jury must have found the presence *105 of malice as well as purpose to kill; but having first found the purpose to kill, as we may suppose, they entered on the inquiry as to malice, under the influenee of an instruction, that the defendant was guilty of murder or not guilty of any crime whatever; thus exposing the defendant to a moral influence against him, which should not have any lodgment in the minds of the jurors.”
The court further say :
“ As an abstract proposition, where the circumstances of a homicide are not known, further than the mere fact that the death was caused by the use of a deadly weapon, we do not deny that the jury may, from such fact alone, infer both malice and a purpose to kill. But where the attending circumstances are shown in detail, some of which tend to disapprove the presence of malice or purpose to kill, it is misleading and erroneous to charge a jury that in such cases the law raises a presumption of malice and intent to kill, from the isolated fact that death was caused by the use of a deadly weapon. In such case the presence of malice or intent to kill must be determined from all the circumstances proven, including, of course, the character of the weapon. It may indeed be said, with much reason, that the use ofa deadly weapon in the taking of life raises the same presumptions whether other attending circumstances be shown or not; and that when other circumstances are shown, they either strengthen or rebut the presumption so arising from the character of the weapon.
The question before us, however, is not one of mere logic; but rather, how would jurors of ordinary understandings interpret and reason upon such a charge ? The instruction was, “if you find from the evidence that the defendant used a deadly weapon in this ease, and that death ensued from the use of such deadly weapon, then the law raises the presumption of malice in the defendant, and also an intent on his part to kill the decedent.’ This was notan abstract proposition. It covered the case before the jury. And in our opinion, a jury of ordinary intelligence might well understand that the law fixed the guilt of the defendant ds a murderer, if the evidence showed that he took the life of the deceased by the use of a deadly weapon, without regard to other circumstances; save only, as they were told in another part of the charge, that he might, under certain circumstances, justify on the ground of self defense. But our objection to the charge is independent of all question of self defense, and relates to it solely as bear-; *106 ing on the case which the state was bound to prove in order to entitle it to a conviction.”
Upon the question whether the jury were justified from, the facts and the law in the case in finding the prisoner guilty of murder in the second degree, the members of this court do not arrive at the same conclusion.
Speaking for myself, and myself only, I think the. verdict is clearly against the evidence ; that is to say, I think the jury were not warranted in finding the defendant guilty of murder in the second degree. I think the testimony shows, as I have already stated, that this young man was being pursued by Sullivan ; that he was receiving bodily injury at the hands of Sullivan, and that during that affray Sullivan received the fatal wounds at the hands of the defendant. When Bennett was called upon in regard to the matter, the next day, by the coroner, his first inquiry was: “ How is the young man that is hurt?” and the coroner said : “He is dead.” He said: “It can not be possible; I can not believe it.” He says in his testimony that he delivered those blows for the purpose of making Sullivan let go of him. The statements that he makes, it seems to me, are entirely consistent with the facts of the case, and might well have existed. The burden of proof is upon the State to show from all the circumstances, clearly and beyond a reasonable doubt that there was a purpose in the mind of this young manto kill — a formed purpose as much as though he said to himself: “I strike you now, and I do it with the intention of killing you.” I do not believe the facts show any such thought existing in his mind at that time. He was in a struggle, endeavoring to get clear, and used his knife during that fracas. It should be remembered that the decedent who was following him, was using a billiard cue that was heavy. It is a formidable weapon, and one, if the blow had taken effect upon Bennett, his death would have laid the young man Sullivan himself open to indictment for manslaughter.
So that from all the evidence, as it looks to me, there seems to be established this state of facts: That in an affray grow *107 ing out of a sudden quarrel, a stab was given which caused the death of Sullivan. The Supreme Court say, in the 29th Ohio St., supra, that although that blow may have been delivered with intent to kill, it does not make murder in the second degree. There must be something more; there must be shown malice in the heart of the party, that he not only delivered the blow with intent to kill, but did it maliciously.
John P. Stein, Pros. Att’y, and S. A. Court, for the State.
King & Hull, for the prisoner.
As has been suggested, it may be that this young man had the knife in his hands and opened it before he says he did, and Sullivan closed with him for the purpose of holding his arms down, so that he might not deliver the blow. That may have been the state of affairs, but I am unable to see how that would make any different result, and from the law of the case, how it would change the act. I think it would still be a homicide during an affray, and would not only come within the definition of manslaughter, but within the general scope of decisions in regard to manslaughter in the state of Ohio.
My associates, however, while they have a feeling within their minds, as I understand it, that it would have been better for the jury to have returned a verdict for a lesser offense than they did, still on the whole facts of the case are unable to say the jury were not warranted in returning a verdict of murder in the second degree.
We, however, all agree that the judgment of the court should be reversed, and the verdict of the jury set aside, and the defendant should be awarded a new trial, and the court so orders it, and that the costs be paid by the State of Ohio.